NATURAL RESOURCES DEFENSE
COUNCIL, et al., Plaintiffs,

v.

Charles CURTIS, et al., Defendants.

No. 97–308 PLF JMF.

United States District Court,
District of Columbia.

Sept. 20, 1999.

Eric Robert Glitzenstein, Howard Mesni-koff Crystal, Meyer & Glitzenstein, Washington, DC, for plaintiffs.

Anne L. Weismann, Eric D. Goulian, U.S. Dept. of Justice, Civil Division, Carter G. Phillips, Nathan C. Sheers, Sidley & Austin, Audrey Byrd Mosley, James Ralph Wright, National Academy of Sciences, Washington, DC, for defendants.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

This case is before me for resolution of disputes arising between the parties during discovery. Currently pending and ready for resolution are three motions: (1) *Plaintiffs' Motion to Compel* ("Plains. Mot."), (2) *Defendant National Academy of Sciences' Motion to Compel* ("Defs. Mot."), and (3) *Plaintiffs' Motion to Strike and/or Respond to the Secretary of Energy's February 9, 1999 Response Regarding the National Academy of Science's Motion to Compel and Memorandum in Support* ("Plains. Mot. to Strike").

### BACKGROUND

Plaintiffs are Natural Resources Defense Council ("NRDC"), Thomas B. Cochran, Ph.D. ("Cochran"), Western States Legal Foundation ("WSLF"), and Tri–Valley Cares ("TVC"). Defendants are the National Academy of Sciences ("NAS") and Charles Curtis, Acting Secretary of the Department of Energy ("DOE"). Plaintiffs allege that DOE violated the Federal Advisory Committee Act, 5 U.S.C.App. 2, §§ 1 et seq., ("FACA") through its use of a report prepared by the

Inertial Confinement Fusion Committee ("ICFC"), an NAS committee.

On March 5, 1997, the court issued an order permanently enjoining DOE from using the committee's report or other work product. On August 6, 1997, the court granted DOE's motion for an expedited entry of injunction. DOE then appealed the injunction on the basis that appellees lacked standing to sue for such relief and that even if they did have standing, such a drastic remedy was not warranted.

On July 17, 1998, the court of appeals held that: (1) DOE had standing to appeal, (2) DOE did not waive its right to appeal by seeking an expedited entry of injunction, (2) NAS did not have standing to appeal, and (3) a remand was required to determine whether the appellees had standing to seek an injunction prohibiting DOE's use of the report, or alternatively, whether other equitable relief could be had.

The court of appeals also directed the district court to:

consider whether FACA's principal purposes—(1) avoidance of wasteful expenditures and (2) public accountability—will be served by granting a use injunction. While a complaint filed after a committee has completed its meetings and is in the process of wrapping up its affairs will likely produce waste if a use injunction is granted, the district court should also consider the magnitude of the waste, the value of the committee's work to the sponsoring federal agency and the effect of the FACA violation on the committee's findings.

*Natural Resources Defense Council v. Pena,* 147 F.3d 1012, 1026 (D.C.Cir.1998).

On remand, the court ordered that plaintiffs inform the court, in light of their additional discovery, whether they would continue to seek a permanent injunction. Plaintiffs originally sought declaratory and injunctive relief to prevent NAS from publishing its report and to prevent DOE from using the report. In plaintiffs' *Amended Complaint for Declaratory and Injunctive Relief* ("Plains. Amended Compl."), plaintiffs now seek an order permanently enjoining DOE from using the report, and an order directing

DOE and NAS to release all materials publicly available under FACA Section 10.

### I. *The Discovery Sought and the Discovery Granted*

#### A. *The Discovery Sought from DOE as to Potential Conflicts of Interest*

Plaintiffs first asked DOE to advise them of:

(1) any arrangements in the past five years that Robert L. Byer or Dr. W. David Arnett had for access to free equipment at Lawrence Livermore National Laboratory ("LLNL") (Interrogatory 8);

(2) discussions concerning or offers for employment or consultancy extended by DOE (or its national laboratories) to members of the ICFC during the past five years, including, if the offer was accepted, the terms of agreement between the parties (Interrogatory 9);

(3) the qualifications necessary to receive a LLNL employee badge and the identification of all ICFC members who got one and when (Interrogatory 10);

(4) the affiliations of members of the ICFC have had with DOE in the past eight years to include (a) consulting agreements (b) employment contracts (c) seats on advisory boards or (d) other arrangements, such as agreements between members's institutions and DOE (Interrogatory 12).

Plaintiffs also asked for documents pertaining to the same topics, *i.e.*, affiliations of ICFC members with DOE (Request for Production 6) and, more generally, the following:

All documents relating to (a) potential or actual conflicts of interest of the ICF Committee or its members; (b) biases or perceived biases of the ICF Committee or its members; and (c) the balance of the views of those serving on the ICF Committee.

(Request for Production 9).

DOE resists this discovery on the following grounds:

(1) "[A]ny alleged conflict of interest have no relevance here, because the Committee was not established by DOE and therefore not subject to Section 5 of the FACA." Letter of November 20, 1998.

(2) Even if section 5 of FACA applied to the ICFC, it does not prohibit conflicts of interest among committee members but instead provides merely that a committee's recommendation not be "inappropriately influenced" by the appointing authority or any special interest. *Defendant Secretary of Energy's Opposition to Plaintiffs Motion to Compel* ("DOE Opp.") at 6. In any event, DOE and NAS have provided plaintiffs with information as to the efforts NAS made to avoid conflicts of interest and ensure balance in the committee membership which should suffice. *Id.* at 7.

(3) Information concerning employment, consultancy and other arrangements entered into after the ICFC issued its report in 1997 is patently irrelevant.

(4) Request for production 9, quoted above, is hopelessly vague since DOE will be forced to guess at what plaintiffs mean by "potential or actual conflicts of interest" or "biases or perceived biases" of Committee or the balance of their views.

#### B. *The Discovery Sought from NAS as to Conflicts of Interest*

Plaintiffs sought the following from NAS:

(1) All documents relating to the preparation of the ICF Report, including any documents relating to: (a) how and by whom the ICF report was prepared and edited, and (b) how and by whom those who reviewed the ICF Report prior to its public release were chosen (Request 4);

(2) All documents relating to the affiliations of ICFC members with DOE, including any documents relating to (a) consulting agreements, (b) employment contracts, (c) seats on advisory boards, or (d) other arrangements, such as agreements between members' institutions and DOE (Request 5);

(3) All documents relating to (a) potential or actual conflicts of interest of the ICF Committee or its members, (b) biases or perceived biases of the ICF Committee or its members and (c) the balance of the views of those serving on the ICF Committee;

(4) All documents relating to DOE's plans to involve the NAS in forming a new committee to provide DOE with advice or recommendations relating to (a) DOE's ICF program; (b) the NIF, or (c) any other matter which the ICF Committee was originally expected to address during its existence.

NAS, protesting that it has already produced all unclassified, non-privileged materials relating to the preparation of the ICF Report, balks at producing the drafts and Reviews of the Report because plaintiffs cannot possibly establish that the NAS's internal processes for drafting the report related to a specific FACA violation, let alone to a harm they suffered. NAS insists its drafting process is not subject to any FACA requirement. Like DOE, NAS challenges the relevancy of the discovery of alleged conflicts of interest.

## II. The General Discovery Dispute

### A. The Parties' Disagreement

Since neither the court of appeals nor Judge Friedman defined more precisely the discovery to be permitted, the parties quarrel as to its scope. Plaintiffs insists that, like any litigant, it is entitled to discover matters which are reasonably likely to lead to admissible evidence and the discovery it seeks as to conflicts of interests and use of the report will yield evidence that is itself relevant, let alone likely to yield relevant evidence. While they admit the necessity of establishing their standing, they see no reason why discovery must be limited to the question of their standing or why discovery as to their standing must precede discovery as to other issues. They therefore insist that they are entitled to both jurisdictional discovery and discovery on what they call the merits.

For their part, defendants are equally adamant that the plaintiffs cannot establish their entitlement to any relief because, for example, FACA does even apply to the ICFC because DOE did not create that committee; NAS did and, in any event, the provisions of FACA on which plaintiffs rely do not apply to the ICFC. The defendants therefore insist that, since the legal questions of FACA's coverage must be resolved in their favor, plaintiffs' discovery seeks information that is, in this sense, can never be relevant for it is directed to issues on which plaintiffs can never prevail as a matter of law.

### B. The Discovery Dispute and the Merits of the Controversy

The federal courts have rarely conditioned discovery upon a showing of legal entitlement to ultimate relief. Confronted with a request for discovery in a case which a party believes that his opponent's position can never be legally sufficient, that opponent can move to dismiss for failure to state a claim upon which relief can be granted or for summary judgment, insisting that there is no genuine issue of material fact and that she is entitled to judgment as a matter of law. Litigants traditionally accompany such motions with motions to stay discovery and they are met with equal regularity by motions filed pursuant to Fed.R.Civ.P. 56(c) that insist that a party should have discovery before being required to respond to the motion for summary judgment. Since such motions and responses are common, it is understandable that the federal courts with equal persistence order in their scheduling orders that motions for summary judgment not be filed until discovery has ended, an approach which postpones any inquiry into what plaintiffs will call the merits until discovery has ended. Defendants have not moved to dismiss or for summary judgment or sought to terminate discovery until their motions are resolved. It is hard to criticize them for not doing so; the court of appeals, after all, expressly authorized discovery. Nevertheless, unless and until defendants do so, permitting discovery and leaving the question of the sufficiency of plaintiffs' case as a matter of law to a point after discovery closes is the way in which the federal courts handle such matters. Therefore, plaintiffs are correct to point out that they are not required to establish a legally sufficient case of their standing and of the applicability of FACA to the ICFC's deliberations and report as a condition of securing discovery and that resolution of the legal issues concerning that applicability is premature until discovery ends.

■ There is another problem with NAS's and DOE's general approach that has to do with the relationship of magistrate judges to district court judges. Absent a request for a report and recommendation from Judge Friedman, I have no jurisdiction to resolve issues which dispose of a controversy. Yet, if I were to rule on plaintiffs' standing at this point or on whether FACA did or did not apply to the Committee I would be resolving, in whole or in part, issues which are unquestionably dispositive because my resolution of them deals with the fundamental questions of plaintiffs' entitlement to judicial relief. Thus, asking me to resolve the question of plaintiffs' standing or the applicability of FACA to the Committee's work puts the cart before the horse and this horse can't pull it. In my view, if NAS and DOE want to be relieved on any further discovery on the grounds that, as a matter of law, plaintiffs lack standing to press their claim, or because FACA does not apply to the ICFC, they must move for summary judgment and a stay of discovery pending its resolution. Until they do, and Judge Friedman resolves that matter or refers it to me for a report and recommendation, I can only resolve this dispute by considering the general standards of discovery under the Federal Rules of Civil Procedure.

## C. General Discovery Standards

■ Any distinction that can be drawn between merits and jurisdiction discovery should not be permitted to disguise that the only legitimate discovery in this case has to be defined by the issues that remain after the court of appeals' decision. Those issues are (1) whether, considering all that is known about the creation of the ICFC, its work, and the historical and potential use of the report, the plaintiffs have standing to continue to prosecute this action and (2) whether, given that same knowledge, the use injunction Judge Friedman initially ordered should be reinstated or be replaced by a narrower order or, perhaps, no order at all. In the latter instance, relief would be declaratory only.

## D. Discovery and Standing

Plaintiffs can first premise discovery on their need to establish FACA violations for the existence of such violations is the heart of this lawsuit. But, even gross violations of FACA's requirements in the service of some or all the Committee's members, or, for that matter other violations of FACA, have nothing to do with their standing. Whatever they do show as to defendants' failure to comply with FACA, plaintiffs still remain obliged to show that the existence and use of the report threatens them with actual harm, that the report and its use are the cause of that harm, and that that harm will be prevented and therefore redressed by the relief they seek. It is self evident that one has nothing to do with the other; illegality is not quantified and there is certainly no principle that the greater the showing of the illegality of one's opponent's behavior, the more likely it is that one has standing. One has nothing to do with the other. It therefore follows that, in the language of the Federal Rules, matters relating to the violations of FACA cannot yield evidence which is relevant to plaintiffs' standing.

## E. Discovery and the Use Injunction

■ The relevance of violations of FACA to continuation or modification of the use injunction is not as attenuated. Tellingly, the court of appeals directed Judge Friedman to consider the effect of FACA violations on the ICFC's output:

> The district court should also consider whether FACA's principal purposes—(1) avoidance of wasteful expenditures and (2) public accountability—will be served by granting a use injunction. While a complaint filed after a committee has completed its meetings and is in the process of wrapping up its affairs will likely produce waste if a use injunction is granted, the district court should also consider the magnitude of the waste, the value of the committee's work to the sponsoring federal agency and the effect of the FACA violation on the committee's findings. As to the last, if the FACA violation appears to have had little deleterious effect on the committee's output and accountability and the public's participation, the district court should withhold a use injunction.

147 F.3d at 1025.

While the court of appeals was speaking of another potential violation of FACA rather

than the violation on which plaintiffs may rely in the future, there is no reason for a different result. All potential violations of FACA bear equally on the calculus of ascertaining the impact FACA violations had on the committee's output and then weighing that impact against the other considerations to which the court of appeals pointed. To reach any other conclusion would be to construe the court of appeals' decision most illogically as permitting discovery of one kind of FACA violation but not another. Without pre-judging the issue as to whether or not there were violations of FACA, for example, in the nature of the financial or other relationships between Committee members and the DOE, this information is discoverable because one must first know whether there were such violations before one can ascertain whether they had a deleterious effect on the committee's output. Factual information bearing on asserted violations of FACA therefore falls within the broad discovery permitted of information which is reasonably likely to yield relevant information. It remains to be seen, of course, whether the information revealed will, in fact, establish FACA violations.

Additionally, Judge Friedman's exercise of discretion as to the scope of injunction he will use will have to be informed by the nature and prevalence of violations of FACA which plaintiffs can establish. There has to be a rational connection between the level of violations of law a court finds and the injunctive action it takes for that injunction to avoid being condemned as unreasonable overkill. It would therefore have to follow that information bearing on alleged violations of FACA is unquestionably discoverable because the nature and frequency of those violations bear directly on one of the remaining issues Judge Friedman must resolve.

▮▮▮ While the discovery sought relates to the general topic of possible violations of FACA and evidence disclosing such violations is relevant, a more specific inquiry must be made as to whether the documents sought as to "conflicts of interest" could disclose a potential FACA violation. The only possibly pertinent section of FACA is its requirement that "the membership of the advisory committee ... be fairly balanced in terms of points of view represented." FACA, section 5(b)(2), 5 U.S.C.A. Appendix 2, § 5. The discovery sought as to access to LLNL deals with access to a building and the free use of equipment in it. I am hard pressed to understand why being permitted access to a building and the free use of the equipment tends to establish the nature of one's views as to a particular scientific or environmental topic. More to the point, plaintiffs have not explained to me why one can fairly deduce a person's views from his being granted access to a certain facility and use of its equipment and, since I have not made any such deductions, I am reduced to guessing that there is some connection between access to a facility and views as to what will be done there. While the discovery standard broadly favors discovery, it cannot be construed to permit discovery into areas where there is some inexplicable connection between two apparently unrelated phenomena when plaintiffs do not explain the connection between them or why access to the building and use of the equipment suggests that the person granted that access and use is likely to entertain a particular view.

The rest of the discovery sought stands on a more secure footing. Human beings, not being angels, can have their views affected by their own interests. It is perhaps for this reason that the common law has never considered an exploration of a witness's bias collateral and has always permitted it to be explored thoroughly on cross examination and proved independently of the witness's denial of its existence. Exploration of the Committee members' financial and professional relationships with DOE bears a sufficient rational connection to the views they may entertain for the simple reason that the views one entertains may be subtly or directly influenced by one's own interests.

With that said, however, it is equally clear that the discovery plaintiffs seek goes much too far in several respects. First, according to the court of appeals decision, the Committee was in existence from May, 1996 to March 2, 1997, but plaintiffs seek information about alleged "conflicts of interest" for either the past five or eight years. Information

sought for any point of time after the committee had completed its work is patently irrelevant. One's views as to a certain topic in 1996 and 1997 cannot be affected or influenced by what occurred in 1998 and 1999 when one's work on the committee was finished. On the other hand, one's views in 1996–1997 may be influenced by events which occurred within a reasonable time before one began to serve on the committee. Unfortunately, the circumstances do not permit a lapidary judgment. Instead, the necessary exercise of discretion permits the conclusion that information pertaining to events in the five years before May, 1996 should suffice. That will be the only discovery that I will permit.

Finally, the defendants are correct to point to the vagueness of the term "relating to" as it is applied to (1) potential or actual conflicts of interest of the ICFC or its members, (2) biases or perceived biases of the ICFC or its members, and (3) the balance of the views of those serving on the ICFC. The words "relating to" are laden with unhealthy unambiguity which may explain why lawyers drafting discovery demands are so fond of them. Worse, the person answering the discovery request must guess as to what plaintiffs mean by a "potential or actual conflicts of interest" and judge himself by a standard which plaintiffs never explain. For all any one knows, plaintiffs' notion of a conflict of interest may be much broader than defendants' and the defendants run the unfair risk of guessing what plaintiffs mean and of hiding "potential conflicts of interest" if they guess wrong. This kind of guessing as to the meaning of such value laden terms, which can mean different things to different persons, is a burden defendants should not have to bear. The only discovery I will permit, therefore, is of documents in which the author refers specifically to whether ICFC members may have conflicts of interests, their biases, the use of either of those terms in the document, or a specific reference to whether there is a fair balance of views among Committee members as FACA requires.

I reach a similar conclusion as to the discovery sought from NAS as to documents relating to the preparation and relating of the ICF Report and how and by whom that report was reviewed. As NAS correctly points out, there is nothing in FACA which governs or regulates how an advisory committee prepares, edits, or reviews its work before it publishes it. The only potential violation of FACA to which plaintiffs could point is that those committee members who actually and physically prepared, edited, and reviewed the report did not reflect a fair balance of viewpoints. Accordingly, I will similarly limit discovery to documents in which the author specifically refers to the conflicts of interest and biases of those persons who prepared, edited or reviewed the report or to whether those persons represented a fair balance of views.

F. *Discovery and Use of the Report*

█ Plaintiffs propounded interrogatories which the DOE answered as to how it may use the ICF report (Response to Interrogatory No. 2), and, more specifically, how it will use that report to influence continued federal appropriations for NIF (*Id.* No. 3) and in the ongoing construction and then operation of that facility. DOE also identified persons who have knowledge as to DOE's plans to obtain advice or recommendations from an advisory committee in the future relating to (1) DOE's ICF program, (2) the NIF and (3) any other matter which the ICFC was originally expected to address during its existence. Finally, DOE explained that it planned to have NAS assess DOE's overall Stockpile Stewardship Program and that that assessment would involve an evaluation of the scientific and technical capabilities of the program to meet the goal of maintaining the safety and reliability of the nuclear weapon stockpile and the goal of preserving the core intellectual and technical competencies of the United States in nuclear weapons. DOE indicated that, while this assessment might consider aspects of the ICF program, it did not expect that this review would address the same questions asked of the ICFC. *DOE's Response to Plaintiffs' First Set of Interrogatories to Federal Defendants*, Number 6 at 5.

**12**

Although it answered those questions, DOE has balked at producing documents which relate to those plans. Indeed, the only difference between the interrogatory which DOE answered without objection and the request for production of documents to which it objected are the differences in phraseology between an interrogatory which asks a question and a request which seeks production of a thing.

Since that it is so, the only objection DOE could possibly make is that a topic or topics which are relevant for the purpose of interrogatories become somehow irrelevant when those topics are the subject of a request for production of documents. That objection makes no sense. The relevancy of a topic of discovery cannot be a function of the kind of discovery sought about it and there is no warrant in the Federal Rule of Civil Procedure which would permit such an illogical result. Therefore, DOE is going to have to produce the documents sought.

■ Plaintiffs sought identical discovery from NAS, seeking documents from it concerning DOE's plans to form a new committee to provide DOE with advice or recommendations relating to (1) DOE's ICF program, (2) NIF and (3) any other matter which the ICFC was originally expected to address during its existence.

Since NAS, unlike DOE, never answered an interrogatory about those topics it preserved its objection to the request.

It should be common ground that documents which fall within (3) and deal with plans to have a new NAS committee deal with matters which the ICFC was expected to deal with are discoverable. The court of appeals identified one kind of harm which plaintiffs might suffer from and which would be redressed by an injunction against the report's use. If the report can be used by the DOE, the motivation to create a new committee to do what the old one did disappears since DOE can use the old report. If DOE does use the old report and does not empanel a new committee, plaintiffs will not have an opportunity to secure whatever benefits compliance with FACA would bestow on them. It would then follow that documents pertaining to the formation of a new commit-

tee to provide advice about any matter the old committee was expected to address bear on the redressability prong of the standing issue and the proper scope of any injunction to be issued and thereby fall within the scope of the remaining issues in the lawsuit. NAS should therefore produce documents relating to DOE's plans to have NAS provide it with advice as to any matter which the ICFC was originally expected to address during its existence.

With reference to the remaining topics of the request, it must be recalled that by virtue of the answers to the interrogatories DOE has already provided as to the work of NAS in the future and my order to DOE to produce the documents which pertain to that topics plaintiffs will secure from DOE everything it has available as to the work of any new committee. The narrow question presented by NAS's objection becomes then whether NAS should be forced to disgorge what it may have as to any new committee which plaintiffs will not secure from DOE as to DOE's plans for a new committee to provide advice as to (1) DOE's ICF program and (2) the NIF.

It would certainly seem that, if the work of the new committee has nothing whatsoever to do with the work of the old committee, the formation of the new committee cannot possibly bear on the redressability of the harm done plaintiffs by the old committee's failure to comply with FACA or the scope of the injunction Judge Friedman should issue as to the use of the work of the old committee. It is possible, however, that old committee's work exceeded what is was originally expected to address so that merely knowing what the new committee will do in reference to what the old committee was expected to do may not present as comprehensive a picture as possible of the relationship between the work of the old committee and the work of the new one. That relationship is, however, crucial to the redressability and scope of injunction questions which Judge Friedman must address. I therefore will permit discovery from NAS of all documents relating to DOE's plans to involve NAS in forming a new committee to provide DOE with advice or recommendations concerning any matter

which the ICFC in fact considered or which it was expected to address during its existence to include (but not be limited to) the DOE ICF program and NIF.

III. *NAS's Motion to Compel*

█ Oddly, plaintiffs, who seek discovery, resist giving any discovery to NAS, forcing NAS to move to compel. Plaintiffs insist that, since the court of appeals found that NAS had no standing to appeal from the entry of the use injunction, NAS has no claim or defense in this action to which any legitimate discovery can pertain.

With all due respect to plaintiffs, their position borders on the offensive. It was plaintiffs who named NAS as a defendant in an amended complaint filed after the court of appeals had ruled. If plaintiffs truly believe that the only parties with legitimate rights to litigate the standing and validity of use injunction questions are themselves and the DOE, why did they name NAS as a defendant? Like the little boy who pointed out the obvious—that the Emperor was not wearing any clothes—one could point out that plaintiffs need only dismiss NAS which, they claim no longer has a dog in the fight, to be rid of its discovery demands.

In any event, plaintiffs' assertion that NAS has no right to discovery is otherwise insubstantial. If, as NAS points out and plaintiffs do not challenge, when "a" sues "b" and "b" impleads "x", the federal courts permit "x" to secure discovery from "a", even though there is no cross claim between them, then it has to follow that a party can certainly secure discovery from a party that has sued it. To reach any other conclusion is to swallow the camel and strain at the gnat. The Federal Rules of Civil Procedure explicitly permit discovery as to any claim one party asserts against another and plaintiffs are asserting a claim against NAS and NAS unquestionably is entitled to discovery.

█ Plaintiffs' other objection to NAS's discovery is even less substantial. As I have pointed out in another context, the federal courts reject out of hand claims of burdensomeness which are not supported by a specific, detailed showing, usually by affidavit, of why weighing the need for discovery

against the burden it will impose permits the conclusion that the court should not permit it. *Athridge v. Aetna Casualty & Surety Co.*, 184 F.R.D. 181, 191 (D.D.C.1998). Plaintiffs' utterly unsubstantiated *ipse dixit* that the discovery sought is burdensome is insufficient.

█ Plaintiffs also object to discovery which inquires as to the beliefs of entities as opposed to individuals. The metaphysics of whether an entity can have a belief should not obscure the reality that an entity, as the collective recipient of the views of the persons who constitute it, can adopt formally or informally a position as to a certain matter. Indeed, one supposes that is why certain people join groups like the groups who are plaintiffs in this case. Asking, therefore, whether that group does or does not entertain a belief is a shorthand way of asking it whether those persons within it who had the responsibility for a particular matter entertained or did not entertain a belief as to a certain fact or theory. NAS's shorthand reference to the beliefs of plaintiffs as to certain issues is therefore as permissible as asking whether either the members of the group or the persons within it concerned with working on a particular matter entertained a particular belief. Lest form be substituted for substance and the vital right of discovery trivialized, plaintiffs must answer NAS's discovery as to their beliefs.

█ Plaintiffs' passing reference to possible invasions of attorney-client or work product privileges is insufficient without a detailed privilege log which they have not submitted. Fed.R.Civ.P. 26(b)(5). Finally, while a court has discretion to postpone responses to contention interrogatories until some other point in the discovery process, plaintiffs provide me with no reason to exercise my discretion to do so now. NAS is therefore entitled to the discovery it seeks now rather than later.

IV. *Plaintiffs' Motion to Strike*

Plaintiffs' motion to strike will be denied.

An order accompanies this memorandum.